1

2

3

4

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

5

6

7

8

9

10

| | |
|---|---|
| **SEQUOIA FORESTKEEPER**<br><br>           **Plaintiff,**<br><br>                **v.**<br><br>**TERESA BENSON, et al.,**<br><br>           **Defendants.** | **1:14-cv-00341 LJO SKO**<br><br>**MEMORANDUM DECISION AND ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT (DOCS. 47 & 55)** |

11

12

## I. INTRODUCTION

13   Plaintiff Sequoia ForestKeeper ("ForestKeeper") challenges the United States Forest Service's

14   ("Forest Service") Decision Notice and Finding of No Significant Impact ("Decision Notice") for the

15   Hume Roadside and Recreation Site Hazard Tree Project ("Hume Hazard Tree Project" or "Project") in

16   the Giant Sequoia National Monument ("the Monument") under the National Environmental Policy Act

17   ("NEPA"), 42 U.S.C. §§ 4321 *et seq*., the National Forest Management Act ("NFMA"), 1600 U.S.C. §§

18   1600 *et seq*., and the Administrative Procedure Act ("APA"), 5 U. S. C. § 706(2). Plaintiff also alleges

19   that elements of the Giant Sequoia National Monument Management Plan ("Monument Management

20   Plan") contravene the Proclamation ("Monument Proclamation") which established the Monument.

21

## II. BACKGROUND OF THE CASE

22   In September 2013, the Forest Service issued a Decision Notice, Hume0176-190,[1] authorizing

23   the implementation of the Hume Hazard Tree Project, and adopting Alternative D from the Project's

24

25   _____

[1] The administrative record for the Hume Hazard Tree Project is numbered "Hume0001," *et. seq*. The administrative record for the Giant Sequoia National Monument Management Plan is numbered "GSNM0001," *et. seq*.

Final Environmental Assessment ("EA"), Hume0191-357. Alternative D proposed the felling of hazard trees along 58 miles of roads and within eleven developed campgrounds and residential areas in the Hume Lake Ranger District of the Sequoia National Forest and the Monument. Hume0176. As described in the EA, hazard trees are dead or damaged trees that are susceptible to falling onto roadways and recreation sites, and are therefore deemed hazardous to people. Alternative D also proposed the sale and removal of 2000 CCF (centum cubic feet, equivalent to 100 cubic feet) of wood as logs over the next two years. Hume0178; Hume0209. The Forest Service also considered Alternative C, which called for felling the same number of trees as under Alternative D; but not for removing them. Hume0206.

Plaintiff appealed the approval of the Decision Notice to the Forest Service in November 2013. Hume0040-68. In January 2014, the Forest Service affirmed the District Ranger's rationale and decision to implement Alternative D. Hume0001-3. On March 1, 2014, the Forest Service announced that it would accept sealed bids for the timber sale. Doc. No. 11-14.

Plaintiff filed a complaint March 7, 2014 and on March 16 moved for a preliminary injunction ("PI") halting the sale and removal of trees under the authority of the Hume Hazard Tree Project. Doc. No. 10-1. Plaintiff alleges, first, that the Forest Service's authorization of the Project is inconsistent with the Monument Management Plan's requirement not to remove trees from the project area unnecessarily, and that this inconsistency violates NFMA's requirement that the Forest Service actions "shall be consistent" with land management plans. Compl. at ¶ 77 (quoting 16 U.S.C. § 1604(i)). Plaintiff's second cause of action alleges the authorization also violates NEPA because the Forest Service failed to disclose how it will determine whether tree removal can be justified and failed to analyze available hazard tree data. Compl. ¶¶ 82-84 (quoting 40 C.F.R. §§ 1500.1(b) & 1502.24)). Plaintiff's third claim alleges that the Monument Management Plan itself is flawed because the "vague and unenforceable" criteria it outlines for the removal of trees is inconsistent with the proclamation establishing the Monument. Compl. ¶¶ 87-88. Plaintiff brings all claims under the APA, 5 U.S. C. § 706(2), on the basis that the Forest Service's approval of the Project and the Management Plan are final agency actions that

2

1   are "arbitrary, capricious, and otherwise not in accordance with law, or without observance of

2   procedures required by law." Compl. ¶¶ 80, 85, & 89.

3       The Forest Service received no bids for its proposed timber sale. Doc. 17. On April 3, 2014,

4   Plaintiff withdrew its PI subject to a stipulation in which parties agreed that the Forest Service could use

5   its own contractors and employees to fell hazard trees, but would not sell the trees or remove them from

6   the Project Area unless this case is resolved in the Forest Service's favor. *Id.* at ¶ 2.

7       On June 4, 2014, Defendant Forest Service District Ranger Teresa Benson issued a decision to

8   withdraw authorization of the decision to sell and remove trees from the Project Area by striking the

9   sentence authorizing this sale from the Decision Notice. Doc. 23-2 ("Withdrawal Notice"). In an

10  accompanying document, Benson explained that it was not economically feasible to use a timber sale for

11  the removal of trees the Forest Service felled pursuant to its stipulation. Doc. 23-3 ("Withdrawal

12  Memo"). Because the Forest Service had considered this situation under Alternative C in the EA,

13  Benson concluded that she did not need to supplement or revise the EA to accommodate the change in

14  position. *Id.* Neither document altered the Forest Service's approval of Alternative D as the preferred

15  alternative. Rather, the Withdrawal Memo stated that the "analysis and conclusions in the original

16  Environmental Assessment are still valid." *Id.*

17      On June 9, 2014, Defendants moved to dismiss the case on the basis that Benson's withdrawal of

18  the approval to sell and remove trees from the project area mooted Plaintiff's claims. Doc. 37. This

19  Court denied Defendants' Motion to Dismiss on the basis that the Forest Service's voluntary cessation

20  of the timber sale did not moot ForestKeeper's claims and that the EA remains a "continuing and

21  brooding presence that looms over Plaintiff's interests." Mem. Decision and Order Re: Mot. to Dismiss

22  and Mot. to Strike (August 2014 Order), Doc. 37 at 8-11. The Court also held that ForestKeeper had

23  standing to challenge the Monument Management Plan. *Id.* at 13.

24      On January 30, 2015, Plaintiff timely filed its cross-motion for summary judgment. Mem. in

25  Supp. of Pl.'s Mot. For Summ. J. (Pl.'s MSJ), Doc. 47. At this time, Plaintiff also moved to admit extra-

3

1    record evidence consisting of two declaration describing scientific analyses Plaintiff alleges the Forest

2    Service should have considered in its decision-making process. Plaintiff's Motion to Admit Extra-

3    Record Evidence, Doc. 48. The Court granted Plaintiff's request for the limited purpose of helping this

4    Court to evaluate whether the Forest Service sufficiently considered how the adoption of Alternative D

5    would affect levels of downed wood in the Project Area. Doc. 53. Defendant timely filed its cross-

6    motion for summary judgment on March 25. 2015. Defs.' Memo. In Supp. of Cross-Mot. for Summ. J.

7    (Defs.' MSJ), Doc. 55. Plaintiff filed a Response/Reply on April 17, 2015. Resp./Reply in Supp. of Pl.'s

8    Mot. for Summ. J. (Pl.'s Response), Doc. 57. Defendants filed their reply on May 8, 2015. Defs.' Reply

9    in Supp. of Cross-Mot. For Summ. J. (Defs.' Reply), Doc. 59. A hearing date was set for May 20, 2015,

10   but the Court vacated the hearing pursuant to Local Rule 230(g).

11                                  ## III. <u>STANDARD OF DECISION</u>

12           Summary judgment is proper if the movant shows "there is no genuine dispute as to any material

13   fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The claims in this

14   case arise under the APA, 5 U.S.C. §§ 701–706, pursuant to which "[a] person suffering legal wrong

15   because of agency action, or adversely affected or aggrieved by agency action within the meaning of a

16   relevant statute, is entitled to judicial review thereof." *Id*. § 702.5 Under the APA, a reviewing court

17   shall "hold unlawful and set aside agency action, findings, and conclusions found to be": "(A) arbitrary,

18   capricious, an abuse of discretion, or otherwise not in accordance with law"; "(C) in excess of statutory

19   jurisdiction, authority, or limitations, or short of statutory right"; and/or"(D) without observance of

20   procedure required by law[.]" *Id*. § 706. Summary judgment is appropriate when the pleadings and the

21   record demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to

22   judgment as a matter of law." Fed. R. Civ. P. 56(a).

23           A court conducting APA judicial review may not resolve factual questions, but instead

24   determines "whether or not as a matter of law the evidence in the administrative record permitted the

25   agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)

1  (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir.1985)). "[I]n a case involving review

2  of a final agency action under the [APA] ... the standard set forth in Rule 56[(a)] does not apply because

3  of the limited role of a court in reviewing the administrative record." *Id.* at 89. In this context, summary

4  judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is

5  supported by the administrative record and otherwise consistent with the APA standard of review." *Id.*

6  Eastern District of California Local Rule 260(a) directs that each motion for summary judgment

7  shall be accompanied by a "Statement of Undisputed Facts" that shall enumerate each of the specific

8  material facts on which the motion is based and cite the particular portions of any document relied upon

9  to establish that fact. In APA cases, such statements are generally redundant because all relevant facts

10  are contained in the agency's administrative record. *See San Joaquin River Grp. Auth. v. Nat'l Marine

11  Fisheries Serv.*, 819 F. Supp. 2d 1077, 1083–84 (E.D. Cal. 2011).

12  **IV. <u>ANALYSIS</u>**

13  **A.     <u>Standing and Mootness as Applied to Plaintiff's First Two Causes of Action</u>**

14  In its Complaint, Plaintiff alleged that the proposed sale and removal of trees in the Hume

15  Hazard project violated NFMA and NEPA. Compl. ¶¶ 78, 83-84. Defendants subsequently withdrew

16  their decision to sell and remove trees when they were not immediately able to find a buyer for the

17  wood. This Court found that the Forest Service's "failure in the marketplace" did not mean that

18  circumstances had changed such that "it would be unreasonable to expect a future timber sale to occur in

19  the Project Area." August 2014 Order at 9. In their cross motion for summary judgment, Defendants

20  argue that circumstances have (again) changed such that "removal of the felled trees is not only highly

21  speculative, it will never occur." Defs.' MSJ at 9. On this basis, Defendants argue that Plaintiff lacks

22  standing to bring their claims.

23  As Plaintiff points out, Defendants appear to confuse standing with mootness. "The existence of

24  standing turns on the facts as they existed at the time the plaintiff filed the complaint." *Skaff v. Meridien

25  N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 571 n.4 (1992)). In contrast, mootness reflects the requirement that the controversy remain live even after the plaintiff demonstrates initial standing." *Skysign Intern., Inc. v. City and County of Honolulu*, 276 F.3d 1109, 1114 (9th Cir. 2002).

Defendants cite to a few Supreme Court cases for the theory that plaintiffs can "lose" standing. Defs.' Reply at 1. These cases, however, reflect that litigants must maintain a personal stake in the litigation; a concept encapsulated by mootness doctrine. First, *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013), presented unique circumstances where an intervener was found not to have standing to appeal a District Court's holding. Moreover, the *Hollingsworth* Court relied on *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) and *Arizonans for Official English v. Arizona*, 520 U.S. 43, 72, 117 (1997), which were decided on mootness grounds, when it addressed Article III's "demands that an 'actual controversy' persist throughout all stages of litigation." *Id.* In *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009), the Supreme Court upheld a district court opinion which essentially found that the parties' settlement agreement mooted the case. *Id.* ("Marderosian's injury in fact with regard to that project has been remedied, and it is, as the District Court pronounced, "not at issue in this case."). Finally, the issue in *Gollust v. Mendell*, 501 U.S. 115, 126 (1991), was whether changed circumstances (acquisition of a corporation) meant that a shareholder plaintiff no longer had enough of a personal stake to prosecute an action seeking redress for insider trading.

This Court discussed the legal standards for mootness in its August 22, 2014 Order. An issue is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000). Even if a case is technically moot, a case may nevertheless be justiciable if one of three exceptions to the mootness doctrine applies: (1) where a plaintiff "would suffer collateral legal consequences if the actions being appealed were allowed to stand"; (2) where defendant voluntarily ceased the challenged practice; and (3) for "wrongs capable of repetition yet evading review." *Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 964 (9th Cir. 2007).

The Supreme Court has addressed this issue squarely:

> Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake. In contrast, by the time mootness is an issue, the case has been brought and litigated, often (as here) for years. To abandon the case at an advanced stage may prove more wasteful than frugal. This argument from sunk costs does not license courts to retain jurisdiction over cases in which one or both of the parties plainly lack a continuing interest, as when the parties have settled or a plaintiff pursuing a nonsurviving claim has died. . . But the argument surely highlights an important difference between the two doctrines.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 191-92 (2000). One important manifestation of the difference between standing and mootness is that "the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.* at 189. In the August 2014 Order, this Court found that Plaintiff had standing and that that the Forest Service's withdrawal of the decision to sell and remove trees fell within the voluntary exception to the mootness doctrine.

Defendants now present evidence in the form of a second declaration from District Ranger Benson attesting to the fact that almost all activities authorized by the Decision Notice and the parties' stipulations have been completed. Second Decl. of Teresa Benson ("Benson Decl. 2"), Doc. 55-3. Benson describes that all hazard trees located in campgrounds have been felled, cut into logs and made available to campground users for firewood. *Id.* at ¶¶ 6-7. According to Benson, "there are no hazard trees remaining to be felled in the campgrounds under the Decision Notice, and all authorized activities have been completed except for burning of the debris/slash piles. . ." *Id.* at ¶ 7. Similarly, Benson testifies that all hazard trees located along roads have also been felled. *Id.* at ¶ 8. She states that all roadside hazard trees have been left on the ground to serve as downed wood material. *Id.* On this basis, Benson concludes, "there is no decision in place which authorizes [tree] removal nor any proposed project currently being planned that would remove any of the logs." *Id.*at ¶ 10. Finally, Benson states: "I am committing that I will not propose any project or activity which sells or removes as saw logs,

1   biomass, or any other wood product (except for wood removed from the Monument under valid personal

2   use firewood permits), any of the trees felled as part of the Hume Hazard Tree project, either under this

3   Project EA, or under any future project decision or proposed sale." *Id.* On this basis, Defendants assert

4   that the Court no longer has jurisdiction to hear the case. Defs.' MSJ at 10; Defs.' Reply at 2.

5           Plaintiff argues that this testimony does not introduce any new facts that would justify revisiting

6   the issue of mootness. Pl.'s Response at 4. Plaintiff explains that its suit did not challenge the Forest

7   Service's decision to fell hazard trees, so the fact that the felling is now complete does not change the

8   circumstances. *Id.* This Court agrees that the mere completion of the felling the trees in the area does not

9   amount to a change in circumstances. Benson's testimony, however, also describes the disposition of

10  these trees; they have all been either been chopped for use as firewood, placed into debris piles for

11  firewood or left on the ground with the intention that they remain there to serve as downed wood

12  material. Benson Decl. 2 ¶¶ 6-8. Benson also expressly commits that none of the felled trees will be

13  removed from the Monument as part of the Hume Hazard Tree Project. *Id.* at ¶ 10. Plaintiff does not

14  dispute these facts. Nor does Plaintiff point to evidence it could produce that would give a fact-finder a

15  reason to discredit Benson's testimony. These facts are significant because they signal a commitment to

16  retain trees under the Hume Hazard Project and effectively moot Plaintiff's claims. Where an agency

17  effectively cancels a challenged action and there is "no immediate prospect of another, similar [action]"

18  that means "the end of the 'case,' constitutionally and practically." *Nome Eskimo Cmty. v. Babbitt*, 67

19  F.3d 813, 815 (9th Cir. 1995).

20          1.      **Voluntary Cessation Exception**

21          Plaintiff argues that the Court should retain jurisdiction of this case under the voluntary cessation

22  exception. Pl.'s Response at 4. This argument is based on the theory that Defendants' representations do

23  not ensure that trees will not be removed from the monument "in the future." *Id*. Voluntary cessation,

24  however, is precluded when (1) "it can be said with assurance that there is no reasonable expectation ...

25  that the alleged violation will recur," and (2) "interim relief or events have completely and irrevocably

8

1    eradicated the effects of the alleged violation." *United States v. Brandau*, 578 F.3d 1064, 1068 (9th Cir.

2    2009). Here, the activity challenged in Plaintiff's first two causes of action is the sale and removal of

3    wood as permitted in the Hume Hazard Project. Compl. ¶¶ 75-85. Defendants' burden is therefore to

4    show that circumstances have changed such the Hume Hazard Project will not support the sale and

5    removal of trees and that there is no other prospect that the Hume Hazard Project will be re-started. *See*

6    *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (finding voluntary

7    cessation did not moot a case where plaintiff may again be subject to allegedly unlawful conduct).

8    Defendants have met this burden with Benson's second declaration because they have shown that the

9    Hume Hazard Project has not and will not support the sale and removal of trees. *Cf. Logan v. U.S. Bank*

10   *Nat. Ass'n*, 722 F.3d 1163, 1166 (9th Cir. 2013) (court retained jurisdiction where bank produced "no

11   evidence or reassurance" that it would not reinitiate the challenged unlawful detainer action.) Thus, the

12   voluntary cessation exception does not apply.

13                    **2.**      **Capable of Repetition, Yet Evading Review Exception**

14           Plaintiff also argues that the "capable of repetition yet evading review" exception applies here. In

15   order to fit this exception, a controversy must meet two requirements: "(1) the challenged action was in

16   its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a

17   reasonable expectation that the same complaining party would be subjected to the same action again."

18   *Murphy v. Hunt*, 455 U.S. 478, 482 (1982).

19           Plaintiff argues persuasively that the first element of this analysis is met because hazard tree

20   projects typically are implemented within one season of the decision. Pl.'s Response at 6-7. In support

21   of this position, Plaintiff points to Benson's testimony describing the timeline of events in this case. *Id.*

22   Notably, Defendants do not challenge this point. This Court agrees that the timeline of the hazard tree

23   plan (several months at most) is consistent with what the Ninth Circuit considers to be short in duration.

24   *See Alaska Ctr. For Env't v. U.S. Forest Serv.,* 189 F.3d 851, 855 (9th Cir. 1999) (two-year permit

25   period satisfies duration element "because the duration of the permit is too short to allow full litigation

1   before the permit expires"); *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329-30 (9th Cir. 1992)

2   (regulation "in effect for less than one year" met durational requirement).

3       Defendants do contest that there may be a reasonable expectation that Plaintiff will confront the

4   same action again. Defs.' Reply at 5-6. Plaintiff argues that its litigation history with the Forest Service

5   reflects that it will. Pl.'s Response at 7-8. The "capable of repetition test" is different from the one for

6   voluntary cessation in that it examines the likelihood of the issue resurfacing, rather than the specific

7   activity challenged. *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1174 (9th Cir. 2002) (holding

8   that Endangered Species Act claim at issue was "capable of repetition" where parties "have been

9   through the same controversy many times," even though previous lawsuits were about different

10  species.). For example, the expiration of Forest Service approval letters allowing mining activities did

11  not deprive the federal court of jurisdiction in a case where Plaintiffs showed that the Forest Service

12  continued to approve similar activities that invoked the same complaint: that doing so without

13  conducting proper biological consultations violated the Endangered Species Act. *Karuk Tribe of*

14  *California v. U.S. Forest Serv.*, 681 F.3d 1006, 1019 (9th Cir. 2012). Defendants cite to several cases to

15  support their theory that Plaintiff must show that the Forest Service will rely on the same challenged

16  administrative action. Defs.' Reply at 6. These cases, however, all invoke instances where an agency has

17  shown that it cannot or will not rely on the *substance* of those former actions. *Feldman v. Bomar*, 518

18  F.3d 637, 644 (9th Cir. 2008) (case not capable of repetition where plaintiffs challenged "only the one-

19  time process by which the final EIS was approved" for eradication of non-native feral pigs in national

20  park, once all pigs were eradicated); *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56

21  F.3d 1071, 1075 (9th Cir. 1995) (no live controversy once the challenged biological opinion had been

22  superseded by a more recent version); *Ramsey v. Kantor*, 96 F.3d 434, 446 (9th Cir. 1996) (case moot

23  where Defendants showed that they were using "a different method of calculating the baseline" than the

24  one challenged by plaintiffs).

25      Also contrary to Defendants' assertion, whether similar events occurred in the past *is* potentially

10

1  dispositive of the application of the "capable of repetition but evading review" exception. *Demery v.*

2  *Arpaio*, 378 F.3d 1020, 1027 (9th Cir. 2004) (repeated past conduct on multiple occasions taken as

3  evidence of likely repetition); *Natural Resources Defense Council, Inc. v. Evans*, 316 F.3d 904, 910 (9th

4  Cir.2003) (same, noting that agency repeatedly applied the same, challenged rationale, "year after

5  year"); *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329–30 (9th Cir. 1992) (one subsequent instance

6  of agency relying on allegedly insufficient biological opinion sufficient to find reasonable expectation of

7  recurrence). This Court has previously applied this exception where the challenged conduct occurred on

8  only one prior occasion. *San Luis & Delta-Mendota Water Authority v. Jewell*, 52 F. Supp.3d 1020,

9  1045 (E.D. Cal. October 1, 2014).

10      Plaintiff argues that it has a reasonable expectation that it will again have to litigate "the issue of

11  whether tree removal is clearly needed and whether the Forest Service can remove trees without first

12  assessing it will meet its down log standards, under the same circumstances as here in future hazard tree

13  projects in the Monument." Pl.'s Response at 7. In support, Plaintiff points to a previous case brought in

14  this Court, which challenged the sale and removal of hazard trees in the Monument under many of the

15  same theories alleged here. Complaint, Doc. 1, *Sequoia ForestKeeper v. Exline*, No. 1:09-cv-01519-

16  OWW-SMS (E.D. Cal. August 26, 2009). In that case, the court denied Plaintiff's motion for a

17  preliminary injunction and the trees were felled and removed before Plaintiff could prosecute the case.

18  *Id.* M.O. 36. Plaintiff also claims that the Forest Service announced on its website that it plans to fell and

19  remove hazard trees from the Lloyd Meadow Road area later this spring. Pl.'s Response Ex. B. The

20  issue in these cases is whether the Forest Service may approve the removal of an unspecified number of

21  hazard trees from the Monument and be compliant with the Plan's Criteria for tree removal. Pl.'s

22  Response at 7. Defendants do not dispute that both the 2009 case and the plans for 2015 involve similar

23  issues. Defs.' Reply at 6. Nor do they dispute that the operative Monument Plan, which Plaintiff also

24  challenges in this action, permits this very activity. Rather, Defendants rely on the erroneous theory that

25  Plaintiff must show that future litigation will invoke the Hume Hazard Tree Project specifically. Defs.'

1   Reply at 6. As discussed in the August 2014 Order, the narrowness of the Forest Service's actions in

2   withdrawing support for the Hume Hazard Project, coupled with Plaintiff's previous litigation and the

3   Forest Service's future plans, show that there is a reasonable expectation that the parties will engage in

4   similar litigation in the future. Thus, a declaratory judgment regarding the Project's compliance with

5   NFMA and NEPA would provide meaningful relief.

6          For these reasons, the Court DENIES Defendants' request to dismiss Plaintiff's first two causes

7   of action.

8   **B.      Jurisdiction to Hear Plaintiff's Third Cause of Action**

9          Defendants' argument that this Court lacks jurisdiction to review Plaintiff's challenges to the

10  Monument Plan relies on a finding that the Court lacks jurisdiction to review the Hazard Tree Project.

11  Defs.' MSJ at 11; Defs.' Reply at 6. As discussed above, the Court does have jurisdiction to hear

12  Plaintiff's first two claims. *See also* August 2014 Order. Therefore, the Court DENIES Defendants'

13  request to dismiss Plaintiff's third causes of action.

14  **C.      Whether the Monument Plan's Tree Removal Criteria Are Arbitrary and Capricious**

15         Plaintiff's third cause of action alleges that the Monument Management Plan should be set aside

16  under the APA because it violates requirements set forth in the Monument Proclamation. Compl. ¶¶ 86-

17  89.[2] The Monument Proclamation provides that trees be removed from the Monument "only if clearly

18  needed for ecological restoration and maintenance or public safety." Proc. No. 7295, 65 Fed. Reg.

19  24,095, 24,097 (Apr. 15, 2000). Plaintiff argues that the criteria set out in the Management Plan allow

20  for trees to be removed for much broader reasons. Pl.'s MSJ at 22-25; Opposition at 18-21. An agency's

21  findings under an Executive Order, however, will only be set aside if they are arbitrary, capricious, or an

22  ─────────────────

23  [2] Executive Orders can be enforceable privately under the APA under "certain circumstances." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997); *see also Sierra Club v. Peterson*, 705 F.2d 1475, 1478 (9th Cir.

24  1983) ("The fact that there is no express or implied private right of action under EO 12088 does not prevent review of agency action under the APA."). Because Defendants do not argue that Plaintiff may not enforce the Monument Plan, the Court assumes for the sake of this motion that it may. *See also W. Watersheds Project v. Bureau of Land Mgmt.*, 629 F. Supp. 2d

25  951, 968 (D. Ariz. 2009) (finding the Sonoran Desert National Monument Proclamation judicially enforceable).

1   abuse of discretion. *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir.

2   1997) (citing 5 U.S.C. § 706(2)(A)). To determine whether an agency violated the arbitrary and

3   capricious standard, this court must determine whether the agency articulated a rational connection

4   between the facts found and the choice made. *Pyramid Lake Paiute Tribe of Indians*, 898 F.2d at 1414

5   (citing *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 982 (9th Cir.1985)). As long as the

6   agency decision was based on a consideration of relevant factors and there is no clear error of judgment,

7   the reviewing court may not overturn the agency's action as arbitrary and capricious. *Amer. Hosp. Ass'n*

8   *v. NLRB*, 499 U.S. 606 (1991); *Citizens to Preserve Overton Park, Inc*., 401 U.S. at 402 (1971). The

9   basis for the decision, however, must come from the agency. The reviewing court may not substitute

10   reasons for agency action that are not in the record. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he

11   focal point for judicial review is the administrative record in existence...."). *Arizona Cattle Growers'*

12   *Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001).

13       The Forest Service developed three criteria to help it determine when there is a "clear need" to

14   remove trees. GSNM05243.  These criteria are:

15            R1) If keeping trees on site would cause "unacceptable fuels accumulation
             and fire severity effects . . .of removing trees would reduce the risk of
16            wildfire . . ."
             R2) If keeping trees on site "would provide a vector for insect or disease
17            ingestations at levels higher than currently known endemic levels . . ."
             R3) If keeping trees on site "would create a public safety hazard or
18            attractive nuisance."

19   *Id.* Mechanical removal is limited to certain areas that make up 23% of the Monument's footprint.

20   GSNM05242. Tree removal is further constrained by certain guidelines that "preclude or impose

21   limitations on resource management activities." GSNM05246. The guideline most relevant to this case

22   is the one stating that "trees may not be removed if they are needed to meet downed wood standards of

23   10 to 20 tons per acre in logs greater than 12 inches in diameter." GSNM05251.

24       Plaintiff argues that the R1-R3 criteria are impermissibly vague, and need to be quantified. Pl.'s

25   MSJ at 22-25; Pl.'s Response at 19. Defendants counter that the Proclamation grants them leeway to

1    develop guidance and allows for it to make case-by-case decisions. Defs.' MSJ at 18, Defs.' Reply at 8-

2    10.

3         Plaintiff points out that a "vague directive" that provides an agency is "unfettered discretion"

4    may be arbitrary. Opposition at 19 (quoting *Arizona*, 273 F.3d at 1250-51). Arbitrariness, however, must

5    be evaluated with respect to the directive the agency implements. *Arizona*, the case relied on most

6    heavily by Plaintiff, involved the review of conditions imposed under an incidental take statement (ITS).

7    *Id.* at 1249. An ITS "[s]pecifies the impact, i.e., *the amount or extent*, of such incidental taking on the

8    species." 50 C.F.R. § 402.14(i)(1)(i) (emphasis added). The Ninth Circuit held that while this generally

9    meant a numerical value would be appropriate, other objective criteria could be substituted "so long as

10   these conditions are linked to the take of the protected species." *Arizona*, 273 F.3d at 1250. The Fish and

11   Wildlife issued a permit stating that an incidental take levels would be exceeded if "[e]cological

12   conditions do not improve under the proposed livestock management." *Id.* at 1249. The Ninth Circuit

13   found the conditions arbitrary on the basis that they failed to establish a link between the activity being

14   permitted (cattle grazing) and the taking of species, *as required by the ESA and its implementing*

15   *regulations. Id.* at 1251.

16        Defendants argue here and in the record that neither the Proclamation nor the scientific literature

17   require numeric standards to be in place at forest planning level. Defs.' MSJ at 18. In a letter to Plaintiff,

18   the Forest Service explained that mechanical treatment will depend on certain factors (i.e. canopy cover)

19   that must be evaluated on a site by site basis. GSNM11862. For this reason, the Forest Service decided

20   not to provide threshold values for the R1-R3 criteria in the Monument Management Plan. *Id.*

21        The Court agrees that while the requirement that trees may be removed "only if clearly needed,"

22   imposes a substantive standard, the Proclamation does not require that the Forest Service quantify the

23   need in the forest plan. Nor does the Proclamation set forth any independent procedural steps that are

24   analogous to an ITS. Thus, there is no basis for Plaintiff's argument that the Management Plan must

25   identify numeric values or ensure compliance with the Proclamation independently. Here the Forest

1   Service found that it would be more appropriate to ensure compliance on a project-by-project basis.

2   GSNM11861. Plaintiff provides no viable theory as to why it was arbitrary or capricious for the Forest

3   Service to do so. The Forest Service is entitled to summary judgment as to this issue.

4   **D.   Whether the Hume Hazard Project Violates NFMA**

5   **1.   NFMA Background**

6   The NFMA and its implementing regulations provide for forest planning and management by the

7   Forest Service on two levels: (1) forest level and (2) individual project level. *Native Ecosystems Council*

8   *v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012) (citing 16 U.S.C. § 1604). On the forest level, the Forest

9   Service develops a Land and Resource Management Plan ("Forest Plan"), which consists of broad, long-

10  term plans and objectives for the entire forest. Forest Plans are designed to manage forest resources by

11  balancing the consideration of environmental and economic factors. *Citizens for Better Forestry v. U.S.*

12  *Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003). The Forest Service implements the Forest Plan when

13  approving or denying site-specific projects. 16 U.S.C. § 1604(i).While NFMA requires that the proposed

14  site-specific actions be consistent with the governing Forest Plan, the Forest Service's interpretation and

15  implementation of its own forest plan is entitled to substantial deference. *Forest Guardians v. U.S.*

16  *Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003). The Forest Service's failure to comply with the

17  provisions of a Forest Plan is a violation of NFMA. *Native Ecosystems Council v. U.S. Forest Serv.*, 418

18  F.3d 953, 961 (9th Cir. 2005).

19  **2.   NFMA Analysis**

20  The Monument Management Plan is a subset of the 1988 Sequoia National Forest Land and

21  Resource Management Plan and subject to NFMA. GSNM05169.

22  **a.   Compliance With Downed Wood Standards**

23  Monument Plan guidelines state that trees may not be removed if they are needed to meet

24  downed wood standards of 10 to 20 tons per acre in logs greater than 12 inches in diameter.

25  GSNM05251. Defendants argue that even under Alternative D, no trees would have been removed

15

1   unless those standards were met. Defs.' MSJ at 13. Plaintiff argues that the Forest Service authorized the

2   timber sale without first determining the standards could be met; and that the data at the time showed

3   that the removal of *any* trees would make compliance with the Monument Plan impossible. Pl.'s MSJ at

4   11. Plaintiff argues that because the only difference between Alternative D and Alternative C is

5   permission to remove trees, and because there is no way to remove trees while complying with the

6   downed wood standards, there was no "rational connection" between these facts and the decision to

7   adopt Alternative D. *Id.*; *see also* Pl.'s Response at 10.

8        The EA clearly states that "the existing level of large down woody debris along the roads is

9   low." Hume0223. It goes on to state that  "a portion of the felled trees would be left to meet the 10 to 20

10  tons per acre standard," and that Alternative D would only allow "the rest of the trees not needed to meet

11  dead and down standards to be removed as logs or firewood." Hume0224. It also explains that the Forest

12  Service will track this compliance by "conductin[ing] monitoring during and after project

13  implementation to ensure the standard is met." Hume0236. The record makes clear that the only

14  difference between Alternative C and D is whether to leave felled hazard trees in place. Hume0378.

15  Thus, it is only logical to assume that the Forest Service anticipated removing *some* number of felled

16  trees when it approved Alternative D over Alternative C. Originally, this number was estimated at about

17  2,000 board feet of wood. Hume0209; Hume0178. This number also appears to have been used to

18  estimate the costs of each alternative. Hume0211. It is unclear, however, where this number came from.

19  Defendants do not identify any basis for its derivation. Therefore, the Court can only conclude it is

20  completely arbitrary. Since the Forest Service relies on these figures throughout the EA and Decision

21  Notice as a basis for its preference of Alternative D, it cannot hide behind the fact that ultimately, no

22  trees were removed. Moreover, Defendants' argument that it is possible that *no* trees would be removed

23  under Alternative D is disingenuous. If they intended to approve this scenario, they would have

24  approved Alternative C.

25       The crux of Plaintiff's argument is that the Forest Service's decision fails to account for how the

1    removal of *any* trees could possibly result in compliance with the Monument Plan. Plaintiff cites to the

2    Forest Service's own admission that the most recent monitoring study estimated that there was only 7.68

3    tons per acre of downed wood material. Hume0223. Using information provided by the Forest Service,

4    Plaintiff estimated in comments that are part of the record that even if *all* hazard trees identified at the

5    time were left in place, that downed wood levels would only reach 8.15 tons per acre. Hume0800.

6    Defendants did not dispute this estimate, or its implications regarding compliance with the Monument

7    Plan, in the record. Nor do Defendants address these issues now in their briefings. Instead, the Forest

8    Service relies on the position expressed in the Decision Notice that "Forest Service personnel would

9    conduct monitoring during and after the project implementation to ensure the standard is being met."

10   Hume0236. Without explaining how this approach might possibly lead to compliance with the downed

11   wood standards, Defendants argue that its bare assertion is entitled to deference and a "presumption of

12   regularity." Defs.' MSJ at 13.

13           An agency's conclusions are entitled to substantial deference when they are rationally related to

14   underlying facts. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29,

15   43 (1983). Here, however, the Forest Service has not explained how its original decision to remove trees

16   is supported by its data; or how its plan to "conduct monitoring" would ensure compliance with the

17   downed wood standards. Given that the evidence placed in the record by Plaintiff runs counter to the

18   agency's decision, the Court cannot see how the Forest Service's silence on the matter may be permitted

19   deference. The Forest Service must rationally explain why its decision to fell trees complies with the

20   Monument Plan's guidelines to be entitled to deference. *Greater Yellowstone Coal., Inc. v. Servheen*,

21   665 F.3d 1015, 1026–27 (9th Cir. 2011) (finding that Forest Service failed to rationally relate predicted

22   loss of whitebark pine with its conclusion that the loss did not present a threat to Yellowstone grizzly

23   population and the delisting decision); *cf. League Of Wilderness Defenders Blue Mountains Biodiversity*

24   *Project v. Allen,* 615 F.3d 1122, 1134 (9th Cir. 2010) ("In the ROD, the Forest Service also explained

25   that 'reduction of competition between trees in overstocked sites through commercial thinning is a hedge

1    against epidemic loss of the larger trees to insect and disease.' Thus, the Forest Service determined that

2    cutting some larger diameter trees was clearly necessary and met the NWFP standard."); *Lands Council*

3    *v. McNair,* 537 F.3d 981, 998 (9th Cir. 2008) ("As explained, in this case, the Forest Service detailed the

4    methodology it used for determining the amount of suitable habitat and acknowledged the assumptions

5    underlying its use of habitat as a proxy."); *Forest Guardians.,* 329 F.3d at 1099 ("It was rational for the

6    Service to conclude that, although there had been failures in the past, monitoring was the *only* way to

7    effectively predict wild ungulate use of the land.") (emphasis added).

8            The Forest Service's approval of Alternative D also relied upon its assumption that Alternative D

9    had economic advantages. However, if no downed wood was removed, then it could not pass off service

10   costs (estimated at $38,000) to a logging operation. Hume0246. Thus, there would be no economic

11   benefit to choosing Alternative D. As the Forest Service admits, economic considerations played a

12   significant role in its evaluation of whether the tree removal was clearly needed pursuant to the criteria

13   identified above. Defs.' MSJ at 14 ("Part of the reason the selected alternative, Alternative D was

14   feasible, is because the tree removal provided a cost offset that 'increased the likelihood of

15   implementing the Project in a timely manner and maintaining public access.'") (quoting Hume0258). As

16   discussed above, Defendants have identified no rational basis for concluding that any trees could be

17   removed from the Monument in compliance with downed wood standards. Similarly, Defendants have

18   no identified any rational basis for its conclusions that selling downed logs would produce enough

19   revenue to cover service costs. Thus, any reliance on economic benefits as a basis for approving

20   Alternative D was also arbitrary.

21           Because the Forest Service's conclusion that its adoption of Alternative D complies with the

22   Monument Plan's downed wood standards is not rationally supported by evidence in the record, it must

23   be set aside. Plaintiff is entitled to summary judgment on this issue.

24                              **b.    Compliance With Other Plan Criteria**

25           The Monument Plan states that mechanical treatment "will only be considered if other methods

do not meet ecological objectives in the project purpose and need." GSNM05246. To evaluate this need,

the Forest Service is directed to analyze "the risks and hazards of leaving trees in the Monument, the

effectiveness of the treatment, and feasibility . . ." *Id.*  These analyses must show that "mechanical

treatment is clearly needed to reduce the risk to acceptable levels, make the project effective in meeting

restoration and protection objectives, and make it feasible." *Id.* To justify tree removal alone, the Plan

requires that maintaining "one or more trees onsite" would meet R1, R2 or R3 criteria. GSNM05243.

The EA describes that the Hazard Tree Project is

> . . . designed to mitigate the public safety hazard of trees or limbs falling
> and hitting people or other targets, adding to existing fuel loads, making
> fire control and emergency evacuation more difficult, or increasing the
> likelihood of vehicle accidents along roadways and designated recreation
> sites where there is a risk to forest visitors from falling limbs or trees.

Hume0257. It goes on to describe that the Forest Service identified hazard trees along roadways, in

several campgrounds and near a residential tract of land. *Id.* The EA concludes that mechanical

treatment posed an "acceptable risk" and that removal as firewood or logs would "help offset some of

the costs" of the Project, "increasing the likelihood of implementing the project in a timely manner and

maintaining public access." Hume0258. Defendants also argue that the Alternative D was approved on

the basis that tree removal was clearly needed for public safety reasons and wildfire protection. Defs.'

MSJ at 15 ("The Forest Service's legitimate concerns for public safety described in the EA are sufficient

to support tree removal and Plaintiff has failed to demonstrate a NFMA violation."). The record suggests

that the Forest Service also concluded that tree removal would minimize infestation. Hume0260.

### (1)   <u>Public Safety</u>

The Forest Service concluded that leaving trees on the ground could "become a hazard to visitors

if they choose to move or alter the position of downed trees . . .large down trees have the potential to roll

and topple onto visitors, causing serious injury." Hume0217. "Leaving the downed trees on site could

create . . . an attractive nuisance (people may climb on the piled trees) . . . Downed trees along roads can

1  create safety hazards by obstructing drivers' lines of sight . . ." Hume0261. Plaintiff argues that this

2  argument is absurd because the EA also describes that under Alternative C, large downed material

3  would be relocated from recreation areas to other places in the monument. Pl.'s MSJ at 15 (citing

4  Hume0224). Plaintiff also claims that there is nothing in the record to suggest that downed trees will

5  actually present such risks. Pl.'s Reply at 13. The Court agrees. The record does not show that trees in

6  any particular area are likely to cause any particular safety hazard if they are not removed entirely from

7  the Monument. Rather, these risks are entirely speculative. Because the basis for concluding that these

8  risks exist has no identifiable basis in fact, it must be set aside. *Forest Guardians v. U.S. Forest Serv.*,

9  329 F.3d 1089, 1099 (9th Cir. 2003) ("An agency's actions need not be perfect; we may only set aside

10  decisions that have no basis in fact, and not those with which we disagree.").

11  **(2)  Wildfire Prevention/Mitigation**

12  The Forest Service argues that downed logs need to be removed from the Monument to reduce

13  risks associated with wildfires. Defs.' MSJ at 15. The EA states that "[l]arge down logs adjacent to

14  roadways would add to existing fuel loads, make fire control and emergency evacuation more difficult . .

15  ." Hume0258. "Alternative C is most likely to leave the most large, woody material on the ground, and

16  therefore have the most potential for future increases in fire intensity and flame lengths in isolated

17  pockets." Hume0244. These conclusions are based, in part, on findings presented in a "Fire\Fuels

18  Specialist Report" ("Fire Report"). Hume0665-667. The Fire Report explained that while both

19  Alternatives C & D would "meet project purpose to maintain public safety," one consequence of leaving

20  downed wood in place would be "increasing the fire behavior potential over many years." *Id.*

21  Plaintiff argues that the Monument Plan only permits tree removal when fuels accumulate

22  beyond an acceptable level of risk. Pl.'s Reply at 13. Plaintiff further argues that the Forest Service

23  never found that fuel load would be unacceptable under Alternative C; nor would the record support

24  such a finding. *Id.* Rather, the Forest Service admitted that Alternative C "would not pose a fire hazard

25  because large boles (20 inches or larger) rarely burn." Hume0180. The fact that the Forest Service never

1  found that Alternative C would lead to an unacceptable accumulation of fuel is not a semantic defect.

2  Rather, it reflects the fact that the Forest Service never estimated how many trees would be left in place.

3  Without doing so, it cannot conclude that these trees will lead to an unacceptable risk. Thus, its decision

4  is not based in fact, and must be set aside.

5        **(3)**     **Disease Management**

6        The Monument Plan allows trees to be removed if they would "provide a vector for insect or

7  disease infestations at levels higher than currently known endemic levels." GSNM05243. The

8  environmental assessment concluded that:

9          . . . the trees identified as falling dangers to people are dead or dying and,
        if left on the ground as down wood, would continue to provide hosts for

10          insects and vectors for disease . . .removing them may help prevent insect
        or disease outbreaks above endemic levels that could kill the majority of

11          trees in the vicinity . . .Therefore, it is expected that removing some of
        these trees would make these forest stands more resilient to insects,

12          disease, and other forest stressors.

13  Hume0260. Plaintiff argues that the Forest Service's conclusions are insufficient because they do not

14  *actually* find that leaving trees on site would result in infestation levels higher than whatever is currently

15  know. Pl.'s MSJ at 18. The Forest Service does not actually dispute this argument in its papers. Nor do

16  Defendants identify facts in the administrative record that would show that leaving trees on site would

17  actually increase levels of infestation. Thus, the Forest Service had no rational basis for approving tree

18  removal based on this criteria.

19        As discussed above, Plaintiff has shown that there is no rational basis for concluding that tree

20  removal under Alternative D would have complied with the Monument Plan's tree removal criteria,

21  violating NFMA and the APA. Therefore, it must be set aside. Plaintiff is entitled to declaratory

22  judgment on this issue.

23  **E.**    **NEPA Claims**

24        **1.**     **NEPA Background**

25        NEPA requires agencies to ensure professional and scientific integrity, by setting forth the

1   methodologies used and making "explicit reference by footnote to the scientific and other sources relied

2   upon for conclusions in the statement." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1160 (9th

3   Cir.2006) (citing 40 C.F.R. § 1502.24), *abrogated on other grounds by Winter v. Natural Res. Def.*

4   *Council, Inc.*, 555 U.S. 7 (2008).[3] "The sweeping policy goals announced in § 101 of NEPA are []

5   realized through a set of 'action-forcing procedures' that require that agencies take a 'hard look' at

6   environmental consequences,' and that provide for broad dissemination of relevant environmental

7   information. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v.*

8   *Sierra Club*, 427 U.S. 390, 410 (1976)). "An agency must set forth a reasoned explanation for its

9   decision and cannot simply assert that its decision will have an insignificant effect on the environment."

10  *Marble Mountain Audubon Soc. v. Rice*, 914 F.2d 179, 182 (9th Cir. 1990).

11       **2.    NEPA Analysis**

12       Plaintiff argues that the Forest Service's failure to disclose its methodology for estimating how it

13  would comply with downed wood standard violated NEPA's prohibition on "uniformed agency action."

14  Pl.'s MSJ at 20. Defendants argue that the Forest Service complied with NEPA by disclosing the method

15  and the results of its 2012 downed wood analysis. Defs.' MSJ at 16. The Forest Service concluded,

16  based on that data, that it would conduct additional monitoring during the project to ensure that the

17  downed wood standard would be met. *Id.* Defendant argues that Plaintiff "conflates the substantive

18  obligations of NFMA with the procedural requirements of NEPA." Defs.' MSJ at 16.

19       To be sure, NEPA does not require the Forest Service to ensure that its projects comply with the

20  Monument Management Plan. Rather, it requires that the Forest Service "set forth a reasoned

21  explanation" for its decision to remove trees from the Monument and not "simply assert that its decision

22  will have an insignificant effect." *Marble Mountain*, 914 F.2d at 182. As discussed above, Defendants

23

24  _____

25  [3] By its terms, Section 1502.24 only applies to preparation of an EIS, but the Forest Service does not dispute that this scientific integrity requirement applied to their EA. Therefore, we assume without deciding that this requirement does in fact apply to the Hume Hazard Tree Project EA. *See Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1019 (9th Cir. 2012).

1   failure to explain how their plan to determine how many trees it will remove on an ad hoc basis fails to

2   do that.

3           Courts defer to agency expertise where the agency shows that data, at least generally, support

4   their conclusions. For example, in *Earth Island Inst. v. U.S. Forest Service*, environmental groups

5   challenged the Forest Service's conclusion in an EA that a planned project would not lead to a change in

6   black-becked woodpecker populations. 697 F.3d at 1018. Plaintiffs argued that the Forest Service erred

7   by not analyzing habitat at the project level. *Id.* at 1015. Citing to several studies in the record that

8   showed that woodpecker populations were stable at the bioregion level, the Ninth Circuit found that the

9   "data sufficiently support[ed] the agency's claim" about the project's impacts. *Id.* at 1020.  In contrast, in

10  *Oregon Natural Res. Council Fund v. Goodman*, the Ninth Circuit found that the Forest Service violated

11  NEPA because it failed to substantiate its conclusion that the expansion of a ski resort into a wildlife

12  corridor would have an "inconsequential effect" on habitat. 505 F.3d 884, 892 (9th Cir. 2007).

13          Here, the Forest Service's data does not support its claim that any amount of tree removal would

14  allow it to establish an adequate quantity of downed wood. In fact, the Forest Service's own reports

15  conclude that there was an inadequate amount of downed wood at the time. Hume0182. Defendants now

16  argue that future monitoring could somehow ensure that that there would be enough downed because

17  "the amount of downed woody debris in an area is not a static value." Defs.' MSJ at 17. However,

18  Defendants do not point to any evidence in the record to show that ecosystem dynamics would

19  contribute to downed wood levels in a manner that would offset the effects of tree removal. Thus the

20  Forest Service's assertion that future monitoring could somehow ensure that there would be enough

21  wood on the ground is not sufficiently supported by the data. *Earth Island Inst,* 697 F.3d at 1020.

22  Therefore, it must be set aside.

23          **V. <u>CONCLUSION AND ORDER</u>**

24          For the reasons discussed above, the Court finds in favor of the Defendants as to Plaintiff's Third

25  Cause of Action and in favor of the Plaintiff as to its First and Second Causes of Action. The Forest

Service's Decision to approve Alternative D must be set aside because it was reached in violation of NFMA and NEPA under the standards dictated by the APA.

IT IS SO ORDERED.

    Dated:  **June 5, 2015**               **/s/ Lawrence J. O'Neill**
                                                  UNITED STATES DISTRICT JUDGE